# Big Mountain Improvement Company's Appeal.

1. A grant of a surface right with a stipulation that it shall not be "for the purpose of laying out a town or building thereon, but only for the purpose of a coal-breaker and dirt-room for the deposit of coal-dirt," is the grant of an easement only although in fee.

2. An easement is a liberty, privilege or advantage which one may have in the lands of another without profit.

3. A parol contract for the exchange of land is not complete when it wants certainty, and possession has not been taken under and pursuant to it.

4. Where a party entered upon land in consequence of a parol promise of the owner to exchange for other land, made improvements with the knowledge of the owner, the latter cannot take advantage of the want of a contract, that would bind him to *convey* the land.

5. A party by whose encouragement expenditures have been made to such an extent as to be incapable of reimbursement except by enjoyment, will be enjoined from disturbing the possession; he is estopped because he would wrong the party by withdrawing his consent.

6. An action of ejectment by the party who would thus be estopped, is not an adequate remedy at law to the defendant.

7. Under the Act of June 16th 1836 the courts may restrain a corporation from doing an unconscionable thing outside of its ordinary business sphere as well as within it.

January 20th 1867. Before WOODWARD, C. J., THOMPSON and STRONG, JJ. READ, J., sick. AGNEW, J., at Nisi Prius.

Certificate from Nisi Prius.

This was a bill in equity by Thomas Baumgardner against The Big Mountain Improvement Company and William P. Jenks, President, Charles W. Trotter, William A. Atlee, Thomas Shipley and D. C. Wharton, Directors of said company, filed April 14th 1862.

The defendants filed a joint answer August 4th; the complain-

ants replied October 4th 1862, and same day the bill, answer and replication were referred to Garrick Mallery, Esq., as examiner and master.

There were numerous matters complained of in the bill, but the appeal limited the inquiry to one question. With reference to that the bill set out that on the 6th day of December 1853 the owners of a tract of land in Northumberland county known as the "Robert Gray tract," "agreed to sell and convey in fee simple to the Big Mountain Improvement Company the whole of the surface right of and in all that certain part of the tract, &c., described, &c., containing about ten acres, deed to be executed whenever the said company demand the same and comply with the covenants, &c." * * * " The surface right hereby granted shall not be deemed or taken to be a right granted to the said company for the purpose of laying out a town or building thereon, but only for the purpose of a coal-breaker and dirt-room for the deposit of coal-dirt;" that afterwards the whole of the tract, through sundry mesne conveyances, became vested in the complainant, and that no reservation or exception of the surface right over the before-mentioned ten acres is contained in any of the conveyances; that the company erected a breaker with the usual buildings and appurtenances on the easternmost line of the ten acre tract; that difficulties and disputes arose between the complainant and the company with respect to the other parts of the tract, and on the 10th day of February 1859, both parties agreed to "leave all matters of damages or trespass outside the ten acres," to three arbitrators whose award was to be final. The bill further set out that at the same time it was agreed verbally between complainant and the president of the company that the complainant should erect a coal-breaker necessary for his operations on the "Gray tract," then contemplated by him, on the north-easternmost portion of the ten acre tract, and that for the purpose of erecting the breaker with the usual appurtenances, &c., the company should surrender to him their right to the surface of $3\frac{1}{2}$ acres of the north-eastern portion of the tract and that in exchange the company should have the surface right to an equal quantity of the Gray tract; that in pursuance of the agreement the complainant took possession of that portion of the 10 acre tract and erected a large and expensive breaker with the other works belonging to it, at a cost of above $16,000, and that the defendants took possession of the portion of the tract taken by them in exchange; that the arbitrators, under the agreement, visited and examined the premises with the president and others interested in the company and the complainant, and that the complainant's workmen were then employed in constructing his breaker, &c., on the portion of the tract surrendered to him; that the president then informed the arbitrators of the exchange which

had been made and that they were not to take into consideration the occupancy of the respective parts exchanged; and that the arbitrators awarded that the company pay to the complainant $1000 in full for all damages of every kind; that the defendants soon after drove stakes to mark the lines of the portion taken by them in exchange; that the complainant, on the 9th of February 1859, entered into an agreement with John J. and William H. Douty for mining coal on the Gray tract, that they were to have the use of the breaker, which it was agreed should be ready for use against the 1st of July 1859, at which time the lessees commenced mining on the tract; the breaker was to be kept in order by the complainant.

The bill further set out that difficulties again arising between the complainant and defendants, the parties met in Philadelphia about the 20th of December 1859 for the purpose of adjusting them, and then agreed, amongst other things, that the $1000 awarded by the arbitrators should be paid and that a conveyance for the surface rights exchanged should at once be drawn and executed.; that subsequently the defendants submitted to the complainant the draft of an agreement as containing the matters agreed upon in Philadelphia, including a stipulation to pay the $1000 and the execution of the deeds of exchange, to which the complainant refused to accede as not containing the stipulations arranged in Philadelphia and as implying in its recital that the breaker had been erected inadvertently and not in pursuance of an agreement; that soon after the 21st of March 1860, a surveyor, employed by the defendants for the purpose, made a survey of the land exchanged and marked the respective portions distinctively on the plot, and from this plot the defendants' attorney prepared deeds purporting to convey to the parties their respective portions as indicated on the plot; that there were prepared by the same attorney releases to be executed by certain mortgagees on complainant's land and that the complainant procured the execution of the releases; that afterwards the breaker of the defendants was burned and they built another more than 1000 feet distant from it, and that in consequence the land which they were to take in exchange having become valueless they refused to execute the deed of exchange, and on the 6th of July 1860 brought an action of ejectment against the complainant and his lessees to recover the possession of the land on which his coal-breaker is erected and for which he was to receive a deed of exchange from the company, which ejectment is still pending. The bill prayed that the defendants might be restrained from proceeding in the action of ejectment, as well as for other relief.

The defendants answered that the complainant is not entitled to relief against the ejectment, because he can avail himself of every defence in the court of law which he can set up in a court

[Big Mountain Improvement Co.'s Appeal.]

of equity, and as the court of law has already jurisdiction of the subject-matter, he is not entitled to transfer the case from that court to the Supreme Court. They deny the parol agreement of exchange, and that they gave the complainant permission to erect his breaker on the ten acre tract, or that the complainant took possession in pursuance of such agreement as he has alleged, or that they took possession of any other land in pursuance of such agreement; they admit they visited the premises with the arbitrators, and that the complainant's workmen were then constructing the breaker, but deny that they had surrendered the surface right, or that Jenks informed the arbitrators of any exchange of land and directed them to confine themselves to the damage, if any, of the trespasses in the location of the drift road, &c.; and Jenks, one of the defendants, states that he then remonstrated with the complainant against constructing his breaker on that location, averring that he had no right to construct it; that the complainant averred that he owned the whole ten acres under a conveyance from the owners of the Gray tract. The answer denies that any stakes were driven to indicate any land exchanged; it avers that complainant's breaker was erected after notice that he was erecting it on defendant's property, and that they knew nothing of his agreement with his lessees; that the agreement which complainant refused to sign was in accordance with the arrangements in Philadelphia; that the complainant was not in a condition in regard to his title to carry out his arrangements; that in consequence of the complainant's refusal to convey the land the defendants were compelled to select another site for their breaker.

To understand the case on the points considered in the Supreme Court, a statement of the evidence, as reported by the Master, is necessary. He reports:—

"The first testimony upon this point" (the exchange) "related to the time when the arbitrators met, who were appointed under an agreement dated March 11th 1859, to whom were submitted all matters in variance between the parties. Mr. Bird, the respondent's witness, speaks of this matter, first, in order of time: that before they left Shamokin, on the day of the arbitration, the complainant said to Mr. Jenks, or Mr. Trotter, 'That, for what he wanted to take of the ten acres, to put his breaker on, he would give them other land that would suit them better, and he proposed to give something more in quantity than he wanted to take of the ten acre surface right.' Mr. Jenks said to him that, if he could do that, they would be willing to make the exchange, and they agreed then that that should be the understanding; and it was to be left to Mr. Van Gaskin to select; and if Mr. Van Gaskin, as the agent of the company, was of opinion that the land that he could give them would suit them better, or as well, he would

agree to make the exchange; and the arbitrators and Mr. Jenks and several others went from the town up to the spot where he was putting up his breaker, and then Mr. Jenks said to the arbitrators, 'the matter of the ten acre surface right you need have nothing to do with; Mr. Baumgardner says he will give us other land that will suit us better, and we have agreed to take it, and it is to be left to Van Gaskin to select; and if he is of opinion that he can give us land that will answer as well, or better, we will make the exchange, and you arbitrators need not have anything to do with the ten acre surface right. We intend to make the exchange. That was after we got up to the place and the arbitrators were going to make up matters to give their verdict.' He also states that Baumgardner had commenced his breaker previously to that time, and was at work at it at that time.

"Mr. Fisk, one of the arbitrators, testified that when they arrived at a point where the line of the Gray tract crosses the Big Mountain Railroad, which point was designated by a notch cut in one of the cross-ties of the railroad, and also painted upon a post or stump of a bush or tree, Mr. Jenks called our attention to that line, and, as nearly as I can remember, his language was this: 'Now, gentlemen, you have nothing to do with this matter of surface right. That has been arranged. That is not the question before you. Mr. Baumgardner and myself have arranged that, and Mr. Baumgardner, with our superintendent, Mr. Van Gaskin, will go on and stake out the ground, and we are to make an exchange with him. We are to give him the surface right below for his breaker and improvements, and we are to take other ground. But that is all agreed upon. You have nothing to do with that.' He also states that the breaker of Baumgardner was then being built. He saw the excavation, and the men were at work putting in the foundation-walls of the present breaker of Mr. Baumgardner: He says he heard no objection to the building the breaker on the other land. A satisfaction was expressed by Mr. Jenks that the matter had been arranged so that Mr. Baumgardner had room for his breaker and improvements, and they had room for their dirt. He confirms the same statement in his cross-examination.

"William A. Cherington, another arbitrator, concurs in the statement made by Mr. Fisk. In his cross-examination, in answer to the question whether it was left open between Mr. Van Gaskin and Baumgardner to select the proper grounds for the purpose of making the exchange afterwards, he says, Not as to the matter of selection as to the matter of its staking off. The matter of selection had been agreed upon, as I understood. Mr. Baumgardner and Mr. Van Gaskin were to have it staked off afterwards.

"Mr. Van Gaskin, the agent of the company, says the first

he recollects about anything being stated was before we got to the Henry Clay Breaker, as we were going up from Shamokin, Mr. Jenks remarked that Mr. Baumgardner was laying his sideing on the embankment of the Big Mountain, on their road-bed. Mr. Baumgardner replied, ' the ground is mine ; it is all mine.' Then when we got up to where they were at work about the breaker foundation, they were stating to the arbitrators what they would have to take into consideration. And I recollect Mr. Jenks made a remark something of this nature, as near as I can recollect, that the exchange of the ground they had nothing to do with ; that Mr. Baumgardner and he had had a talk, and they would fix that matter without giving them any trouble about it. He says that is the substance of the remark to the arbitrators. He thinks it was at the same time that Mr. Baumgardner asked Mr. Jenks where he would have it. He said, ' I don't know. I leave it to my superintendent to be the judge. He knows better what we want.' And it was agreed that I should make choice of the piece of ground in lieu of the piece they were building their breaker and putting their lateral railroad on."

The master reported as to the parol contract of exchange :—

" I cannot find any parol contract for the exchange of the surface right that will bring the case within the principles laid down in the decisions. * * * The alleged contract did not describe the property to be exchanged, and was too uncertain to be enforced in equity, and possession, the only evidence of part performance, had been taken by both parties before the date of the alleged contract."

He also reported that none of the unexecuted papers, as contended by the complainant, were written contracts.

The complainant contended before the master that the defendants were equitably estopped from interfering with him in the enjoyment of the breaker and the improvements connected with it. On this question he reported :—

" I shall not take time to refer to the authorities upon this question, but state that from all the evidence in the case, it appears to me to be inequitable that defendants should take from complainant his improvements because there has been a subsequent disagreement between the parties concerning the ground which defendants were to receive in exchange, or an omission by Mr. Van Gaskin to make the selection.

" If the complainant refused to comply with the contract, he would be liable to an action for damages, in which compensation could be recovered by the defendants."

He decided finally :—

1. That no parol contract for exchange of the surface right has been proved and so far executed that it can be enforced in equity.

[Big Mountain Improvement Co.'s Appeal.]

2. That there is no written contract containing a description of the property proved, so as to take the case out of the statute.

\* \* \* \* \* \* \* \* \* \*

4. That, under the facts of this case, I find that defendants are estopped in equity from claiming the surface right on which complainant's improvements are erected.

\* \* \* \* \* \* \* \* \* \*

10. That the action of ejectment is not the proper remedy in this case, and if it could be maintained, the remedy would not be as effectual as a decree in equity.

11. That an injunction be issued, restraining the defendants from prosecuting the pending ejectment, or from instituting any other action for the recovery of the same premises.

To this report exceptions were filed, which were overruled by Mr. Justice STRONG, and the report confirmed.

And it was further decreed that the defendant, the Big Mountain Improvement Company, and all persons claiming under said company, be perpetually enjoined from further prosecuting the action of ejectment pending in the Court of Common Pleas of Northumberland county, against the defendant and his title, &c.

The defendants appealed.

*S. Dickson*, for appellants, cited Eberly *v.* Groff, 9 Harris 251; Evans *v.* Bicknell, 6 Ves. 184; Fry on Spef. Per., § 384; Lestor *v.* Foxcroft, 1 Lead. Cas. in Eq. 507, note; Robertson *v.* Robertson, 9 Watts 52; Cole *v.* White, 1 Br. C. R. 409; Greenlee *v.* Greenlee, 10 Harris 234; Moore *v.* Small, 7 Id. 469; Dabsell *v.* Crawford, 1 Pars. R. 37; Armand *v.* Wilt, 9 Barr 54; Roberts on Fr. 135; Allen's Estate, 1 W. & S. 134; Parker *v.* Smith, 1 Coll. C. C. 618; Clare Hall *v.* Harding, 6 Hare 273; Duchess of Kingston's Case, 2 Smith L. C. 661, note; Crest *v.* Jack, 3 Watts 238; Dunn *v.* Spurier, 7 Ves. 235; Kenney *v.* Brown, 3 Ridgway 519; 1 Eq. Cas. Ab. 355; 2 Id. 522; 4 S. & R. 244; Alexander *v.* Kerr, 2 Rawle 92; 3 Id. 326; Larkins' Appeal, 2 Wright 459; Miranville *v.* Silverthorne, 12 Id. 149; Gliddon *v.* Strupler, 2 P. F. Smith 400; Addison on Cont. 864, 865; Black *v.* Hepburn, 2 Yeates 331; Caldwell *v.* Fulton, 7 Casey 476; Funk *v.* Haldeman, 3 P. F. Smith 229; Dark *v.* Johnson, Leg. Int., Vol. 34, No. 21, May 24th 1867; Jackson *v.* Bud, 9 Johns. 298; Millington *v.* Goodtitle, And. 106; Stephens N. P., *Ejectment;* Smith *v.* Barrett, 1 Lev. 114; 2 Gale & Davison 435; Clap *v.* Draper, 4 Mass. 466; Doe *v.* Bent, 1 T. R. 701; Loring *v.* Bacon, 4 Mass. 576; Stockwell *v.* Hunter, 11 Metc. 448; Griffith *v.* Cochran, 5 Binn. 105; Marvin *v.* Willink, 7 S. & R. 298; Murphy *v.* Hubert, 4 Harris 50; Smith *v.* McIvor, 9 Wheat. 532; Russell *v.* Clark, 7 Cranch 69; Taylor *v.* Carryl, 12 Harris 259; s. c., 20 How. 584; Crane *v.* Brun-

nell, 10 Paige 335; 1 Story's Eq. I. 72; Lynch *v.* Sumral, 1 Marsh. (Ky.) 469; Pratt *v.* Pond, 5 Allen 59; Merrill *v.* Lane, 16 Ohio 373; Grant *v.* Quick, 5 Sand. S. C. 612; Foot *v.* Sprague, 12 How. 355; Winfield *v.* Bacon, 24 Barb. 120; Kemp *v.* Pryor, 7 Vesey 237; 1 Spence Eq. Jur., Book 4, 684 *et seq.*; Harrison *v.* Nettleship, 2 M. & K. 423; Van Vleck *v.* Clark, 38 Barb. 316; Farebrother *v.* Welchman, 3 Drewry 122; Gomperts *v.* Pooley, 4 Id. 448; 17 & 18 Vict. c. 125, sec. 83, 22 Stat. at Large 454 (1854); Tennig *v.* Higgs, 1 De G. & J. 388; Magnaw *v.* Miner R. Co., 3 Drewry 130; Carron Iron Co. *v.* Mc-Claren, 25 Eng. L. & Eq. R. 51; 5 H. of L. 416; Evans *v.* Bembridge, 8 De Gex M. & G. 100; Jones *v.* Geddes, 14 Sim. 606; Bank *v.* Railroad Co., 28 Verm. 470, 477; 2 Seton on Decrees 877 *et seq.* (ed. 1862); Hilliard on Inj., c. 6, 27; Id. 88; 2 Smith's L. C. 651; Shaw *v.* Beebe, 35 Vt. 204; Rangely *v.* Spring, 28 Me. 127; Woods *v.* Wilson, 1 Wright 379; Philhower *v.* Todd, 3 Stock. (N. J.) 54; 2 Smith's L. C. 757; Forsyth *v.* Day, 46 Me. 176; Adlin *v.* Gove, 41 N. H. 465; Gunn *v.* Bates, 6 Cal. 263; Lewis *v.* Carstairs, 6 Whart. 207; 5 W. & S. 205; Ware *v.* Cowles, 24 Ala. 446; Morton *v.* Hodgdon, 32 Me. 327; The Cambridge Inst. *v.* Littlefield, 6 Cush. 216; Watkins *v.* Peck, 13 N. H. 360; Darlington's Appeal, 1 Harris 430; Carpenter *v.* Stilwell, 1 Kernan 61; 2 Smith's L. C. 767.

*J. E. Gowen*, for appellee, cited Carncross *v.* Lorimer, 2 Jur. N. S. 149; McKellip *v.* McIlhenny, 4 Watts 317; Strickler *v.* Todd, 10 S. & R. 74; Rerick *v.* Kern, 14 Id. 267; Robinson *v.* Justice, 2 Pa. R. 19; Swarz *v.* Swarz, 4 Barr 358; Hamilton *v.* Hamilton, Id. 103; Lefevre *v.* Lefevre, 4 S. & R. 241; Folk *v.* Beidleman, 6 Watts 339; Marsh *v.* Weckerly, 1 Harris 250; 2 Eq. Cas. Abr. 522; Beaupland *v.* McKeen, 4 Casey 130; Miranville *v.* Silverthorne, 12 Wright 147; Stevens *v.* Stevens, 11 Metc. (Mass.) 251; Dyer *v.* Sandford, 9 Id. 395; Angell on Watercourses 351; Washburn on Easements 543; Queen *v.* Chorley, 12 Ad. & E. N. S. 515 (64 E. C. L. R. 513); McKinney *v.* Reader, 7 Watts 124; Wood *v.* Lake, Sayre's Rep. 3; Ong *v.* Campbell, 9 Watts 392; Boyce *v.* McCullough, 3 W. & S. 429; Glidden *v.* Strupler, 2 P. F. Smith 400; Somerset Coal Co. *v.* Harcourt, 2 De G. & J. 596; Duke of Beaufort *v.* Patrick, 17 Beav. 60; Wesley Church *v.* Moore, 10 Barr 273; Painter *v.* Harding, 2 Phila. R. 59; McGowen *v.* Remington, 2 Jones 63; 1 Story's Eq. Jur. § 70–72.

The opinion of the court was delivered, May 13th 1867, by

THOMPSON, J.—The plaintiff's bill contains a variety of matters in regard to which relief was prayed, but was refused by the

master, with a single exception, for good reasons, as his report abundantly shows, and affirmed by my brother Strong on a hearing at Nisi Prius. The subject excepted from this result was a prayer for an injunction to restrain the defendants from prosecuting an action of ejectment brought in Northumberland county for the recovery of the possession of about three acres of land, occupied by the plaintiff as the site of a coal-breaker and connecting improvements.

These works, the plaintiff alleges, were erected on the ground in controversy with the full knowledge, acquiescence and assent of the defendants. The main argument here was upon this point, and as we think the other subjects of the bill were properly disposed of and need no further examination, we will confine what we have to say to this one question exclusively. The facts found by the master show that the appellants on the 6th December 1853 contracted with the owners of the "Gray" tract, situate in Coal township, Northumberland county, for the purchase "of ten acres of surface right" of the tract in fee; the extent of which grant is explained in the articles of agreement as follows: "The surface right hereby granted shall not be deemed or taken to be a right granted to said company for the purpose of laying out a town, or building thereon, but only for the purpose of a coal-breaker and dirt-room for the deposit of coal-dirt." This was but the grant of an easement although described to be in fee, which is generally defined to be "a liberty, privilege or advantage which one may have in the lands of another without profit:" Gale & Whatley on Easements 6.

Under this grant, accurately defined by a survey, the defendants erected at the south-eastern end a coal-breaker in 1854, and continued the occupancy of the land until after their breaker was burned down in 1860, when they erected a new breaker at a different place on a different tract, and since then have occupied the ground but little, if any.

Prior to 1859, the complainant became the purchaser in fee of the "Gray" tract without any reservation in his deed or notice in the title of the previous grant of the surface right in the ten acres to the defendants. This is not, however, of much consequence in the case, as the company's possession was notice of their right. Early in 1859, the complainant entered upon the north-eastern end of the ten acres sold to defendants, with a view to the erection of a coal-breaker preparatory to mining from the Gray tract, the fee of which he owned. The circumstances of the entry are not distinctly proved by the master; but the plaintiff's bill alleges it to have been made pursuant to a parol contract for an exchange of lands between the plaintiff and defendants, contemporaneously with an agreement to refer certain matters in

4 P. F. Smith—24

variance relative to "damages for trespass outside of the ten acres," dated the 10th of February 1859.

Although this restriction as to the damages for trespass looks like the admission of the existence of a contract of some kind in regard to the plaintiff's entry, yet the contract of exchange is distinctly denied in the answer, and not found by the master; or rather the master finds against the existence of such a parol contract with such part execution as would take it out of the operation of the Statute of Frauds and Perjuries. Whatever there was like a contract between the parties, it was defective as a complete parol contract wanting in certainty as well as of possession taken pursuant and under it. At this time authorities are not needed to prove that these objections are fatal to an alleged parol sale, and not the less so to a parol contract for the exchange of land. Under this state of proof we think the master could have done no otherwise than to have found against the plaintiff on the allegations in the bill of an executed parol exchange.

This brings us to consider whether, although such a parol contract as avoids the statute was not shown by the plaintiff, yet whether there was not such an agreement between the parties and such promises by the defendants to accept "other land" in exchange for that taken possession of by the plaintiff, together with such encouragement in an expenditure of money and labor by the plaintiff on the faith of such agreement and promises of the defendants as would render it inequitable and a fraud upon him to permit the latter to revoke their promises and disturb his possession? The master finds this point in favor of the plaintiff, and we think upon abundant testimony. As already said, the agreement of reference excluding trespasses on the ten acres looks like an acknowledgment of an agreement that the plaintiff was not considered a trespasser, and he was probably in the possession at that time. But on the 11th of March, when the parties and *arbitrators* met on the ground to view the alleged cause of damages on account of trespasses committed by the parties on each other, and to determine all "cause and causes of action both in law or equity or otherwise" between them, they were distinctly informed by the president of the company, in presence of the plaintiff, and assented to by the latter, that the arbitrators were to have nothing to do with the matter of their surface right; that that matter had been arranged and was not before them; that Mr. Baumgardner and himself had arranged it; that the superintendent, Mr. Van Gaskins, was to stake out the ground which Baumgardner was to give the company in exchange for that occupied by him on the ten acres. "We are to give him," said Jenks, the president, according to the testimony, "the surface right for his breaker and improvements, and we are to take other ground. But this is agreed upon, and you have nothing to do with it."

The arbitrators acted and made their award without taking into consideration the alleged trespass of the plaintiff, and he went on without let or hindrance, or notice of objection by the defendants, and completed his breaker in the July following, at a cost of from $14,000 to $16,000. This conversation took place within a very short time after the plaintiff had entered into the possession, and nearly ⁺' whole expenditure was made subsequently. Although this conversation or agreement was not binding at law, for want of writings, yet it is in conscience, so far as to preclude the defendants from taking advantage of the want of a contract that would bind them to convey the land. They could only avoid its effect in equity by evidence of bad faith on part of the plaintiff. That does not appear against him. On the contrary, he ran out an equivalent in extent to the land occupied by him on another part of the tract for the defendants, which they refused; and afterwards he assented to the staking out by superintendent Van Gaskin of land selected by him after the works were completed. It will be remembered that he was the party to do this on part of the company at the arrangement disclosed before the arbitrators. It was not until the breaker was erected, and all the expense incurred, and disputes had again arisen between the parties about other matters, that an intention was manifested by the defendants to reclaim the land on which the plaintiff's coal-breaker had been erected by bringing their ejectment for it. It was too late then to hope to succeed in that undertaking.

On a kindred point, Gibson, C. J., in Swartz v. Swartz, 4 Barr 358, said: "The principle of the case is, that the revocation would be a fraud, and to prevent that a chancellor will turn the owner of the soil into a trustee *ex maleficio*." So in McKellip v. McCheney, 4 Wright 317, after referring to the doctrine of an equitable defence, in Todd v. Strickler, 10 S. & R. 74, Kennedy, J., said: "In Rerick v. Kern, 14 S. & R. 267, it was held that a parol license given without consideration to use the water of a stream for a saw-mill, in consequence of which the grantee went to the expense of erecting a mill, could not be revoked by the grantor at pleasure." *   *   *   * These cases are likewise a sufficient answer to the objection, that the privilege claimed to have been granted here was either an incorporeal right, and if so, ought to have been granted by deed, or if not, it was an interest in land, and ought therefore to have been granted at least by a writing signed. They also show that whenever a party has induced another to repose upon the faith of his promise, though verbal, to expend his money or labor, for which he can only be remunerated by the enjoyment of the thing so promised, equity will compel the promissor to give such a deed or writing as shall be requisite to secure the promissee.

Without stopping to inquire whether a decree for a conveyance

[Big Mountain Improvement Co.'s Appeal.]

under the circumstances presented by the case before the learned judge is the usual remedy or not, there are numerous authorities, and those cited by the counsel for the appellee are full to the point, that a party by whose encouragement expenditures have been made to such an extent as are not capable of reimbursement except by enjoyment, will be enjoined from disturbing the possession. Equity estops him because he would wrong the other party by withdrawing his consent: Trexel *v.* Lehigh Iron Co., 6 Wright 513. There is no higher morality than is contained in the equitable principle that where between two innocent parties a loss occurs, it is to be borne by him whose act occasioned it. The morality of the rule which throws the loss upon him who occasions it, is certainly much less questionable where it results from bad faith or fraud. The result is the same ; the protection of the innocent being the object of the rule in both cases. We agree with the court below and the master, that the defendants should be estopped, under the circumstances disclosed and found by the master, from proceeding in the action of ejectment against the plaintiff.

It is objected to this, however, that in the action of ejectment this equitable principle can be administered, and therefore the plaintiff has an adequate remedy at law. To this we cannot agree. The writ of ejectment is the process of the plaintiff. The defendant cannot use it to settle his equity in the premises. He must wait until it pleases the plaintiff to proceed, and when he does, he may withdraw his suit at will, and renew the contest again and again, until three verdicts or the Statute of Limitations puts an end to the controversy. At no stage is a definite result achieved so as to put an end to controversy until the game of three verdicts is played out. While, therefore, ejectment subserves an important purpose in the administration of equitable principles, it is not to a defendant an adequate remedy in its administration, for the reasons given. If he have a good equitable defence, why shall not a defendant have it so administered as to be available and save him from repeated attack ? It is better for all parties that litigation be avoided—*interesse respublica ut sit finis litium.* Under the Act of 16th June 1836 the courts are invested with full chancery powers over corporations ; see Commonwealth *v.* The Bank of Pennsylvania, 3 W. & S. ; and can supervise and control them through the equity powers conferred by the act as fully as a Chancellor of England could do in the exercise of his functions. May we not, therefore, stay the hand of a corporation from doing an unreasonable thing outside of its ordinary business sphere as well as within it ? No limitation of this nature is found in the act. The plaintiff brought his bill against the defendants for an account and sundry other things, among them the matter in hand. There was no doubt of the court's jurisdiction as to most of them, and it is not a reason

[Big Mountain Improvemont Co.'s Appeal.]

for dismissing the bill that but one matter remains for a decree. There was no demurrer or special defence as to that, and the parties having submitted to the jurisdiction and answered fully, and exhibited their proofs, the case is undoubtedly in a position to be disposed of according to equity.

This is not added to raise a doubt of our right to enjoin the defendants from proceeding in their ejectment suit, but *quâcunque viâ datâ*, we are authorized to decree conformably to equity as between the parties. We are for sustaining the decree at Nisi Prius, and it is accordingly affirmed. The costs of this appeal to be paid by the appellant. .